IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

Abigale L. Miller,  :  Case No. 10-28606-TPA
:
:
Debtor  :  Chapter 11
:
:
:
:
:
:
:
:
:

FILED
4/8/15 12:49 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## CERTIFICATION OF TRANSCRIPT

AND NOW, this __7th__ day of April, 2015, it is hereby **CERTIFIED** that the accompanying transcript of the proceeding held on March 22, 2013 in regards to, the Application to Employ Brian G. Raymond, Esquire as Special Counsel for the Debtor Nunc Pro Tunc at Document No. 236, In the above captioned matter is the official transcript of record. This Certification is preliminary and the transcript is subject to appropriate correction following a complete review of its content by the Court.

Thomas P. Agresti, Judge
United States Bankruptcy Judge

```
              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA


                                    .
IN RE:                              .    Chapter 11
                                    .
Abigale L. Miller,                  .
                                    .
         Debtor.                    .    Bankruptcy #10-28606 (TPA)
.............................................................

                    U.S. Steel Tower, 54th Floor
                          600 Grant Street
                        Pittsburgh, PA 15219
                          March 22, 2013
                             10:07 a.m.


                           TRANSCRIPT OF:
                MOTION TO EMPLOY SPECIAL COUNSEL
              BEFORE THE HONORABLE THOMAS P. AGRESTI
                 UNITED STATES BANKRUPTCY JUDGE


   APPEARANCES:

   For The Debtor:              Donald R. Calaiaro, Esq.
                                Calaiaro & Corbett, PC
                                310 Grant Street-Ste. 1105
                                Pittsburgh, PA 15219

                                David Z. Valencik, Esq.
                                Calaiaro & Corbett, PC
                                310 Grant Street-Ste. 1105
                                Pittsburgh, PA 15219

   For Brian G. Raymond:        Michael Kaminski, Esq.
                                Blumling & Gusky, LLP
                                1200 Koppers Building
                                436 Seventh Ave.
                                Pittsburgh, PA 15219
```

2

    Audio Operator:              Adriane Alampi

    Transcribing Firm:        Writer's Cramp, Inc.
                                   63 Dakota Drive
                                   Hamilton, NJ 08619
                                   609-588-8043

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

```
 1              THE COURT:  All right, next we have the matter of
 2    Abigale Miller, case #10-28606, Motion to Employ special
 3    counsel nunc pro tunc.  Mr. Calaiaro.
 4              MR. CALAIARO:  Good morning, Your Honor.  Donald
 5    Calaiaro for the Debtor.
 6              MR. VALENCIK:  David Valencik for the Debtor.
 7              MR. KAMINSKI:  Good morning, Your Honor.  Mike
 8    Kaminski for Brian Raymond and with me today is Brian Raymond.
 9              MR. RAYMOND:  Good morning, Your Honor.
10              THE COURT:  Well, here's my problem with this.  I
11    appreciate Mr. Raymond being here.  He probably should have
12    been here two years ago.  Tell me, Mr. Calaiaro, how -- I know
13    you -- the Debtor now wants to pay everything in full, pay all
14    unsecureds.  You have the money.  And then do an "oh, never
15    mind."  How can I allow that?  I mean, the procedures say this
16    fellow should have been appointed a long time ago.  I've been
17    pressing the Debtor from day one to give me more information
18    about this reality T.V. show.  So it's not like you weren't on
19    notice that the Court was concerned about these things.  And
20    it was only after I pressed to get all the documents in that
21    now you file this belated Motion to Appoint counsel.
22              MR. CALAIARO:  Your Honor, what happened here is
23    that my client, when we filed the bankruptcy did not have this
24    reality show.  It developed during the Chapter 11.
25              THE COURT:  Mr. Calaiaro, I know all that.  And
```

1   every time you came before me, I kept pressing for details as
2   to what's going on.  And you would tell me, "Well, the first"
3   -- it began first of all with, "Well, we only got a couple
4   dollars thrown at us because we've got to get through the
5   first season and if it gets renewed, then there's hope we'll
6   start making money."  And then we got into the second season
7   and I kept pressing, "What's going on here?"  And there was
8   more smoke and mirrors as far as the filings and what I was
9   being told.  And then finally, if I hadn't been channel
10  surfing in December and saw the Ultimate Dance Mom Competition
11  in Las Vegas with screaming fans on T.V., I would have never
12  -- no one would have been the wiser.
13           MR. CALAIARO:  Well --
14           THE COURT:  And that's when I demanded that you
15  produce all the documents and we find out that Mr. Raymond's
16  been employed for well over a year.
17           MR. CALAIARO:  All that I can tell you, Your Honor,
18  is that in the beginning she had a very modest income.  When
19  Mr. Raymond got involved, her income went up dramatically
20  because a lot of his efforts.  The money --
21           THE COURT:  Well, why didn't you know about this?
22  Why wasn't she reporting it to you then?  I assume she wasn't,
23  otherwise you would have filed it and made the Court aware of
24  it.  Is that what you're telling me?
25           MR. CALAIARO:  Well, I can't tell you why she didn't

1  report it.  I only can tell you that she didn't.  They didn't
2  pay her until the end of last year.  And when you were asking
3  the questions and we were -- the Court's aware that it took
4  us, I think, two or three extensions of time to comply with
5  your Order because we were having such difficulty getting the
6  documents from the producer.
7           THE COURT:  Oh, come on.  I don't buy that at all.
8  I -- you -- isn't this -- isn't Mr. Raymond her agent or her
9  lawyer?
10          MR. CALAIARO:  Mr. Raymond had to get involved with
11 us and he helped us get the documents to comply with your
12 Order.
13          THE COURT:  Mr. Calaiaro, here's the problem.  I've
14 been asking for the documents for years.  I've been asking for
15 the detail for years and you keep giving me, "Oh, it's" -- and
16 she's been in Court a couple times.  This is what bothers me.
17 You know, I -- the appointment of -- I think as a practical
18 matter, the -- you know, I'm not as much offended by a nunc
19 pro tunc appointment of Mr. Raymond now that we're going to
20 get 100% on the secureds.  What I'm offended by is that the
21 whole bankruptcy process relies upon the honor system and the
22 good faith conduct of the Debtors, and counsel for the Debtor,
23 in apprising the Court as to what's going on, month to month
24 in the Operating Reports, and definitely when the Court
25 convenes status conferences.  You tell me what's going on and

                                                                        6

1    I rely upon that.
2         And then only because of a coincidence do I find out that
3    your gal is now this big, successful reality T.V. lady doing
4    all this stuff.  And coincidentally, when I demanded the
5    documents, lo and behold she's making $40,000 an episode and
6    all -- nothing that's ever been reported and it goes back to
7    October -- you know, it goes back quite far.  And if I had not
8    raised that, I would -- the Court and the people in interest
9    would never have known about, nor would the creditors have
10   been paid their money, except over a five year Plan.  Until I
11   made you disclose that, that was your Plan, if you recall.  It
12   was only when the cat was out of the bag that all of a sudden
13   now she's going to throw $100,000 at unsecureds and get them
14   all paid up immediately.  Can I just look the other way in
15   light of that record, Mr. Calaiaro?
16            MR. CALAIARO:  Your Honor, I don't expect you to
17   look the other way.  You've made it very clear, and I will
18   tell you that the extent of the efforts we've made to comply
19   with your Order has cost Ms. Miller dearly in our time.  And I
20   will tell you that I still do not believe that I know
21   everything.  There's a real problem here --
22            THE COURT:  Then maybe I should turn this over to
23   the U.S. Trustee and the U.S. Attorney, make a referral.  Is
24   that what you're telling me?
25            MR. CALAIARO:  No, I'm not.  What I'm trying to tell

1  you is that when I look at the things that have happened, the
2  producer tells Ms. Miller one thing before Mr. Raymond's
3  involved and then different things happened.  He pays things
4  on her behalf and then lo and behold, they come out of what is
5  her compensation.  There are still disputes between the
6  producer and Ms. Miller about what's happened here.  We are
7  talking to an accountant about the fact that the producer is
8  deducting from her withholding taxes from numerous states that
9  she has no contacts with.  There's still serious accounting
10 issues between the producer and Abby Miller.
11           THE COURT:  Okay, that may well be and that's not
12 the issue.  The issue is disclosure and her duties and
13 responsibilities and what kind of sanction the Court imposes
14 either against counsel or the Debtor.
15           MR. CALAIARO:  I think the Court's efforts so far
16 have obligated the Debtor to probably spend 35 to $40,000 in
17 lawyer time answering the Court's questions.  She's --
18           THE COURT:  I don't know that.  What lawyer, you?
19           MR. CALAIARO:  Us.
20           THE COURT:  I mean, Mr. Raymond's never even been
21 appointed, so his time --
22           MR. CALAIARO:  No --
23           THE COURT:  -- technically isn't compensable.
24           MR. CALAIARO:  Mr. Raymond's time is compensable on
25 a contingency fee basis.  He gets a commission based upon her

1  income.

2          THE COURT:  Not unless he's appointed by the Court,

3  it isn't compensable.

4          MR. CALAIARO:  I understand that, Your Honor.

5          THE COURT:  Okay?

6          MR. CALAIARO:  But he --

7          THE COURT:  So don't -- you know, that's where I --

8  Mr. Calaiaro --

9          MR. CALAIARO:  I'm not suggesting --

10          THE COURT:  -- I'm disappointed in your handling of

11  this case, I'll be honest with you.  You've led me to believe

12  over the last three years that this was a struggling wannabe

13  reality T.V. star and that's not the case at all now that I've

14  reviewed the contracts and what the payment schedule is.

15          Regardless of if she's getting all of it or not, I was --

16  a totally different picture was painted to me.  I'll give you

17  the benefit of the doubt that you didn't know about it, but

18  that doesn't, you know, obviate your failure to keep tabs on

19  the Debtor, especially when I raise these questions hearing

20  after hearing.  And I was -- you told me that there was a

21  different scenario in place.  And she sat through a number of

22  those hearings.  And to me that's -- I don't know.  You know,

23  now again, now she's got the money and she wants to make it

24  all right.  But the problem is she wasn't going to make it

25  right until she got caught and that's the quandary I'm in

9

```
 1   right now.
 2              MR. CALAIARO:  I understand the Court's difficulty.
 3   I do understand that if the Court allows us to go forward, we
 4   will pay the creditors sooner because as soon as we get to
 5   a --
 6              THE COURT:  Well, I'm going to do -- That's going to
 7   happen.  I don't -- the question is what do I do to sanction
 8   her for her misconduct and what do we do, you know, as an
 9   appropriate, you know, for consequences for what she did here
10   by, you know, manipulating the bankruptcy process.  And she's
11   a smart, savvy lady --
12              MR. CALAIARO:  I have to --
13              THE COURT:  -- to come in here and act like she
14   doesn't know what's going on.  I don't buy that for a minute.
15   You know, when you watch her on T.V., Mr. Calaiaro, she's
16   Dance Mom, man.  She's the -- what did I see?  The beast is
17   back, is that one of the most recent advertising campaign,
18   dancing to the tune of, what was it, Flashdance?
19              MR. CALAIARO:  I don't want to try and be
20   disrespectful to a situation, but my experience with Abby
21   Miller is totally different from the persona on T.V.  And
22   without sounding irreverent of the T.V. world, I don't know if
23   reality T.V. is really reality.  I think --
24              THE COURT:  I don't -- I'm not going to get in --
25   come on.  I'm not -- this is reality.  Reality here is she's
```

1   got duties and obligations to the Court and full disclosure,
2   and she breached those duties.  Now the question is just to
3   come in and throw money at the problem and expect everything
4   to go away, you know, that -- to me, that's not fair to
5   everybody else that comes into this Court and does everything
6   they're supposed to do, and works hard to disclose the status
7   of current events.  And our whole system is bent -- built on
8   good faith, honor, and the integrity of the participants.  And
9   what happens is we get people like this in here and that's
10  what gives the whole system a bad name.  And I feel compelled
11  to have to do something about it --
12          MAR. CALAIARO:  But what I'm --
13          THE COURT:  -- but I'm just not sure what I'm going
14  to do.  Go ahead.
15          MR. CALAIARO:  -- what I'm trying to suggest to the
16  Court is that when Abby Miller came into our office the first
17  time, we dealt with a woman who had no idea what was happening
18  in her business.  She was in our office about a week before a
19  tax sale and had no idea that her real estate taxes had gone
20  unpaid for three or four years.  My experience with Abby
21  Miller is that, contrary to what your perception of what's on
22  T.V. is that, she is not someone that's --
23          THE COURT:  No, no.  It's my perception of what
24  happens here coupled with what I see, okay?  I don't buy --
25  when she comes in here and starts crying and wailing and then

1  immediately turns off the tears when she gets a beneficial
2  ruling, to me, that lacks sincerity, okay?  I've made my own
3  judgment as to her credibility and demeanor -- by her
4  demeanor, okay?  So I'm not -- but when you put everything in
5  context, especially after the many times that I admonished you
6  and her as to the need to be totally forthcoming with all the
7  information, and then to float a Plan that provided for long-
8  term payment of unsecureds until circumstances changed and the
9  Court became aware, just by chance, that there was a whole
10 different reality out there.  And then all of a sudden she
11 comes in and throws money at it -- at the situation, that's
12 the problem.
13      So let's not go off on the, you know, "Woe is me, poor
14 Abby Miller."  I mean, she's sophisticated enough to land this
15 deal, to get as far as she has, to be making this kind of
16 money.  And this is just basic honesty.  And this was her most
17 important matter from a business point of view to get beyond
18 this.  And for her to have -- not disclosed this information
19 is troubling to the Court.
20      Okay, enough said.  I don't know what I'm going to do.
21 Mr. Raymand, Mr. Kaminski, anything to add at this point?
22           MR. KAMINSKI:  Yes, Your Honor.  Whatever issues the
23 Court has with Ms. Miller, and I haven't been involved so I
24 don't know, I think it's fair to say that Mr. Raymond
25 shouldn't be tagged with that.  He didn't know of the pendency

1   of the Chapter 11 proceedings when he was retained.  It would
2   be a huge hardship on him if the nunc pro tunc approval wasn't
3   granted.  Whatever sanction you're going to impose on
4   Ms. Miller, he shouldn't be tainted with that.  He did his
5   job.  He provided a huge benefit to the estate.  I've read
6   Arkansas.  I've read F/S Airlease.  I know technically that's
7   not supposed to matter, but when you look at the
8   circumstances, you have a guy 3,000 miles away from this
9   proceeding.  Somebody comes to him to represent a reality T.V.
10  star, or reality T.V. person.  She wasn't even a star at the
11  time.
12              THE COURT:  Yes, she's a star now.  She might not
13  have been when she first saw him.  Go ahead.
14              MR. KAMINSKI:  Right.  He increased her compensation
15  exponentially.
16              THE COURT:  See that's my problem.  Okay, I guess
17  that doesn't lie at the foot at your fellow.  How much has he
18  been paid to date?
19              MR. KAMINSKI:  He's been paid roughly $77,000.  He
20  tells me that that was one-third of his revenues last year.
21              THE COURT:  Okay, all right.  I -- you know, here, I
22  have sympathy for Mr. Raymond.  I appreciate him being here.
23  You know, this just -- there's $77,000 that was never
24  disclosed in the monthly operating reports.  And that's just -
25  - that just goes again to my problem here.  Now this lady

13

1   comes in and wants to do a never mind.

2         MR. KAMINSKI:  And -- you know, and in fairness to
3   her, in fairness to Mr. Calaiaro, that money went directly
4   from the production company to Mr. Raymond.  You know, it -- I
5   don't know how they accounted for it, but it wasn't like it
6   was hitting her bank account and then going to Mr. Raymond.
7   So, you know, maybe that is the reason why it wasn't
8   disclosed.  You know, I don't know, but, you know, the reason
9   we're here today is the application to engage Mr. Raymond nunc
10  pro tunc.

11        Under the circumstances, I think you have a very
12  compelling and unusual circumstance such that under the
13  holdings of <u>Arkansas</u> and <u>F/S Airlease</u>, Your Honor has
14  justification for approving his retention nunc pro tunc.
15  We'll file a fee application if he's approved.  Mr. Raymond
16  quite frankly asked, "Should we file a Fee Application?"  I
17  said, "No, I don't want the Judge to think we're presuming
18  that he's going to approve."

19        THE COURT:  No, that's okay.  Yes, that's all right.
20  I wouldn't have looked at it anyhow until we resolved this --

21        MR. KAMINSKI:  Right.

22        THE COURT:  -- part of it.  Let me talk to
23  Mr. Raymond a little bit.  Mr. Raymond, since you're here, we
24  might as well hear from you.

25        Okay, I appreciate you coming and showing your concern

1    and respect for the Court on the issue before the Court.  Had
2    Abby Miller done the same, we wouldn't be here right now,
3    okay?  So that's the problem. And again, it doesn't lie at
4    your feet here.  And tell me, though, you're -- this is an
5    ongoing process?  You're still working on obtaining revenues
6    and working through the production company for Ms. Miller and
7    her reality show, is that correct?
8              MR. RAYMOND:  That's correct, Your Honor.  It was on
9    a commission basis, as is customary.
10             THE COURT:  All right.  What is the plan going
11   forward?  I mean, is she -- you know, is this a year by year
12   thing or is there a long-term engagement now because of the
13   show's relative success or where are we?
14             MR. RAYMOND:  Yeah, agreements such as this have
15   options for subsequent seasons.  And so if the show does well
16   enough or the various shows do well enough, then the network
17   will order -- they'll exercise that option to order an
18   additional season.  So that same agreement applies and
19   there's, you know, incremental bumps to the fee for the
20   participant.
21             THE COURT:  And you anticipate future dealings with
22   Ms. Miller and this production company right now?
23             MR. RAYMOND:  Perhaps.  You know, there perhaps may
24   be further opportunities in the entertainment world for
25   Ms. Miller that I would be a part of and help broker on her

1   behalf.

2          THE COURT:  All right.  Well, for that reason, I too
3   am familiar with the relevant case law as to this, very
4   familiar as a matter of fact.  But I'm going to allow the
5   appointment nunc pro tunc in order to, you know, continue the
6   income stream for the Debtor.  I think you're a critical
7   player in it and you essentially have built up a relationship
8   on her behalf with this production company and despite the
9   horror stories on how she is or is not being paid and how
10  terrible things are, she needs somebody who is knowledgeable
11  in the area to continue dealing on her behalf.  And I'm going
12  to allow that to continue, okay?

13         MR. RAYMOND:  Thank you very much, Your Honor.

14         THE COURT:  But if you would file a Fee Application,
15  just so everything's disclosed.  I don't see any problem with
16  approving it now in light of the success you've had in turning
17  her dream into reality in a {quote} "reality show", I guess.
18  But in any event, we'll allow you to go forward.  As far as
19  what I'm going to do with the Debtor long-term, I still have
20  to consider that, okay?

21         MR. RAYMOND:  Okay, thank you very much, Your Honor.

22         THE COURT:  All right, thank you.  All right,
23  counsel, we will sign that Order.  Thank you.

24         ALL:  Thank you, Your Honor.

25      (Court adjourned)

Case 10-28606-TPA    Doc 426    Filed 04/08/15    Entered 04/08/15 12:50:33    Desc Main
                    Document      Page 17 of 17

                                                                        16

 1                          CERTIFICATION
 2   I certify that the foregoing is a correct transcript from the
 3   electronic sound recording of the proceedings in the above-
 4   entitled matter.
 5
 6
 7   *Lewis Parham*                                        4/7/15
 8
 9
10   _____              _____
11   Signature of Transcriber                           Date